**ROBERT J. KAVANAGH, Bar ID 013573**
Law Office of Robert J. Kavanagh, PLLC
90 South Kyrene Road, Suite 1
Chandler, Arizona 85226
(480)831-3040
robertkavanagh@azbar.org

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> SAMUEL T. DOBOS, ) <br> ) <br> Defendant ) <br> ) <br> _____ ) | NO. CR08-0612-005-PHX-NVW <br><br> **DEFENDANT SAMUEL DOBOS' OBJECTIONS TO THE DRAFT PRE-SENTENCE INVESTIGATION REPORT** |

Defendant Samuel Dobos, by and through undersigned counsel, pursuant to Rule 32(f), Federal Rules of Criminal Procedure, hereby submits his objections to the draft Presentence Investigation Report (PSR).

RESPECTFULLY SUBMITTED this 14th day of May, 2010.

s/ Robert J. Kavanagh
Attorney for Defendant

## OBJECTIONS

**I.     Part A - The Offense**

Objections 1-5 are based on the factual allegations in the draft PSR.

**Objection 1 - Page 4, Paragraph 9 The Offense Conduct**

Defendant objects to the portion of this paragraph that states that Defendant Dobos knowingly and willfully devised a "cash back" scheme. The evidence presented at trial does not support the factual assertion that defendant knowingly and willfully devised the "cash back" scheme. Defendant participated in the conspiracy to some extent but defendant did not "devise" the scheme.

**Objection 2 - Page 4, Paragraph 10 The Offense Conduct**

Defendant objects to the portion of this paragraph that states that defendant coordinated the scheme and recruited others to further the scheme. The evidence presented at trial does not support the factual assertion that Defendant Dobos coordinated the scheme and recruited others to further the scheme. The only evidence presented at trial that defendant recruited anyone was the testimony of Co-defendant Dorel Irimiciuc. The defendant contested Irimiciuc's story. Despite having the ability to access potentially corroborating evidence, such as telephone bills for international toll calls, credit card bills, and the testimony of Irimicuic's son, Marius, the government presented no evidence that defendant recruited Irimicuic besides Irimicuic's self-serving testimony. Irimiciuc was a cooperating witness whose plea agreement allowed him the opportunity to escape with a misdemeanor tax evasion conviction.

Defendant objects to the portion of the paragraph that states the defendant located at least 23 properties for straw buyers. The evidence presented at trial simply does not support the factual assertion that defendant located at least 23 properties for straw buyers.

**Objection 3 - Page 4, Paragraph 11 The Offense Conduct**

Defendant objects to the portion of this paragraph that states that defendant utilized his former neighbor, Natasha Swallows, to submit purchase contracts for five of the homes purchased by co-defendant Bunea. The evidence presented at trial does not support that factual

assertion. The only evidence that the government has to support this factual assertion is possibly the testimony of Co-defendant Natasha Swallows.

### Objection 4 - Page 4, Paragraph 12 The Offense Conduct

Defendant objects to the portion of this paragraph that states that defendant directed Co-defendant Swallows to omit separate addenda to purchase contracts to at least two loan officers. Again, the only evidence that the government has to support this factual assertion is possibly the testimony of Co-defendant Natasha Swallows.

### Objection 5 - Page 5, Paragraph 16 The Offense Conduct

Defendant objects to the portion of this paragraph that states that defendant gave Co-defendant Irimiciuc $37,500 from an account owned by co-defendant Morar. Defendant asserts that the statement is factually incorrect.

### Objection 6 - Page 7, Paragraph 23 Culpability Assessment

Defendant objects to the portion of this paragraph to the extent that it expressly or implicitly states that defendant recruited Co-defendant Babeti to purchase each of the 10 houses purchased by Co-defendant Babeti. Again, this statement is factually incorrect. Defendant does not recall evidence presented at trial or otherwise that supports this statement.

### Objection 7 - Page 7, Paragraph 25 Culpability Assessment

Defendant objects to the portion of this paragraph that states that defendant recruited Co-defendant Irimiciuc [to participate in a cash back mortgage fraud scheme]. See Objection #2.

### Objection 8 - Page 7, Paragraph 26 Culpability Assessment

Defendant objects to this paragraph. Defendant did not recruit others [to participate in a "cash back" mortgage fraud scheme] or provide direction. Defendant did sell a house that he owned to Co-defendant Babeti. The details of that sale are provided in defendant's plea agreement. Defendant did not pay for Co-defendant Irimiciuc to fly from Romania to Phoenix for any purpose or at any time. Defendant did not find properties for straw buyers. Defendant did not participate in "the organization" or knowingly benefit from the activities of the organization. Defendant objects to the statement that defendant is responsible for the entire purported loss amount of $6,623,618. Defendant benefited from the sale of his house to Co-defendant Babeti, as set forth in the plea agreement.

Defendant objects to the characterization of him as an organizer or leader of criminal activity that involved five or more participants. The only trial witness who implicated defendant in wrong-doing was Co-defendant Irimiciuc and that was reference just two houses.

Cooperating Co-defendant Catherine Zebarth, a loan officer for Smart Mortgage, and who was involved in at least six home purchases, testified at trial that she did not know defendant and never met him. Zebarth did not implicate Defendant Sam Dobos in any wrong-doing. She provided no evidence of defendant being a leader or organizer.

Co-defendant Azadegan, a business partner of Co-defendant Cipriano Ionutescu, testified in trial that defendant was present at one of the several houses that was purchased but defendant remained in his truck, not participating in the discussions. Defendant's wife, Georgiana Dobos, a licensed real estate agent, interacted with Azadegan. Azadegan testified that Georgiana Dobos told him that she represented her father, Gheorge Babeti, in the purchase. Co-defendant Azadegan further testified at trial that defendant was present at a Starbucks, Shea and Tatum Blvds., during a meeting between Azadegan and Georgiana Dobos regarding the purchase of one of the houses, but defendant did not participate in the business conversation. Instead, defendant stood off and out of the way while he held one of his children. Cooperating Co-defendant Azadegan did not implicate Defendant Samuel Dobos in any wrong-doing. He provided no evidence of defendant being a leader or organizer.

Government witness Stan Adelin, a former receptionist and assistant escrow officer for a title agency involved in this case, testified at trial that defendant was at Stan's office one time, and during that visit, defendant was with both Co-defendant Dorel Irimiciuc and his son, Marius Irimiciuc. Government witness Stan testified that Defendant Dobos did not direct Stan to do anything, did not tell Stan to falsify anything, and did not tell Stan to adjust HUD-1forms or any other forms. Witness Stan provided no evidence that Defendant Sam Dobos was a leader or organizer.

Government witness Korey Makela, a loan officer at a mortgage brokerage firm involved in this case, testified at trial, among other things, as follows:

- Makela dealt almost exclusively with G. Dobos, a licensed realtor;

-4-

- Makela did not deal with Defendant Sam Dobos in loan application matters;
- G. Dobos referred numerous potential clients to Makela;
- Makela met at G. Dobos' house 20-25 times and 20-25 times at Starbucks, N. 7th Street and E. Bell Rd.; sometimes Defendant S. Dobos was present but he never participated in the meetings; often several people were present; G. Dobos appeared to be in charge, issuing various orders to those present, usually in Romanian;
- in Makela's dealings, G. Dobos was always the point of contact;
- regarding loan applications, Makela dealt strictly with G. Dobos;
- Defendant Sam Dobos did not provide verifications of rent or employment to Makela for prospective buyers;
- G. Dobos referred Co-defendant Dorel Irimiciuc to Makela; and
- Makela processed loan applications for both Dorel and Marius Irimiciuc.

Makela provided no evidence of Defendant Sam Dobos being a leader or organizer.

Government witness Manolescu Valeriu testified at trial under a grant of immunity that Defendant Sam Dobos referred him to real estate agent Natasha Swallows (co-defendant) to assist in purchasing homes to remodel and resell for a profit. Manolescu testified that Defendant Dobos was not present when he met with co-defendant Swallows at her office and that Defendant Dobos did not participate in the business discussions. Manolescu testified that Defendant Dobos did not tell Manolescu to lie on any of the paperwork. Manolescu provided no evidence of defendant Sam Dobos being a leader or organizer.

The evidence, or lack of evidence, shows that Defendant Sam Dobos was a minor participant and should receive a 2-level reduction in his offense level. USSG § 3B1.2(b).

**Objection 9 - Page 8, Paragraph 32 Victim Impact**

Defendant objects to this paragraph to the extent that it states that 20 financial institutions and financing companies were negatively impacted by the offense. The draft PSR does not identify the 20 financial institutions and financing companies or how they were "negatively impacted."

**Objection 10 - Page 9, Paragraph 36 Offense Level Computations**

Defendant objects to the addition of 18 levels to the base offense level, which was based on the intended loss amount of more than $2,500,00 but less than $7,000,000 ($6,623,618). "'Intended loss' means the pecuniary harm that was intended to result from the offense." USSG § 2B1.1, cmt., n. 3(A)(ii)." Defendant did not intend to cause more than $2,500,000 in pecuniary harm. Defendant did not intend to cause any pecuniary harm at all. As far as Defendant Sam Dobos knew, the intent of the most of the buyers was to renovate the bulk of the houses and convert them into adult assisted living homes. Evidence of that intent was presented in trial. The government's witness and a co-defendant, Brandon Azadegan, testified that the intent was to renovate the houses and convert them into assisted living facilities. The intent was to increase the value of the houses. *See U.S. v. Crandall*, 525 F.3d 907, 914 (9th Cir. 2008)("Defendant's fraudulent scheme was intended to enhance the marketability and value of the apartments which were sold. Defendant did not intend that the buyers would suffer any loss. Hence, the loss, if any, suffered by the buyers must be measured in terms of 'actual loss,' not intended loss."). From Defendant Dobos' perspective, the loss, intended or actual, was neither a virtual certainty nor probable.

In further support of Defendant's lack of intent to cause a loss, loans were obtained for the appraised value of the houses. For example, for the property at 16942 East Monterey Drive, Fountain Hills [Superseding Indictment, doc. 259, ¶ 31], the sales price was $767,000 and the July 16, 2006 appraisal was for $770,000. See Exhibit 1. The seller was Co-defendant Azadegan and the buyer was Co-Defendant Babeti. Another example is the property at 4933 West Fallen Leaf, Glendale [Superseding Indictment, doc. 259, ¶ 29]. The sales price was $900,000 and the October 4, 2006 appraisal was also $900,000. Co-defendant Natasha Swallows was the real estate agent on this property. See Exhibit 2. A third example, the property at 18402 N. 75th Avenue, Glendale [Superseding Indictment, doc. 259, ¶ 31], the house that Defendant Sam Dobos owned and sold, the sales price was $625,000 and the July 26, 2006 appraisal was for $652,000. See Exhibit 3. Co-defendant Georgiana Dobos was the real estate agent, the buyer was Co-defendant Babeti, and Co-defendant Zebarth was the mortgage broker. Defendant Sam Dobos had little to do with the sale of 18402 N. 75th Avenue other than to sign the paperwork.

In each case, the appraisal was done near in time to the actual sale. The value of the houses at the time of the loans was the fair market value, according to the appraisals. The government provided no evidence that the appraisers were complicit in the fraudulent scheme.

Further, the loss amount is unsupported and speculative. The draft PSR states that the loss amount was based on the difference between the initial loan amount financed and the foreclosure sale price of the houses. PSR at ¶ 21. However, the draft PSR lacks the foreclosure sales price for each of the houses. The draft PSR lacks information as to who owned the properties when sold after foreclosure. The draft PSR lacks information as to whether the original loans were sold to third parties, and if so, for how much. Finally, the draft PSR lacks any information or analysis as to whether the sales price of the houses after foreclosure were due to the drastic decline in the real estate market or from the wire fraud. The government's own trial witness, Dorel Irimiciuc, testified that he and Defendant Sam Dobos intended to buy houses, remodel them, and resell them for a profit, but that the real estate market fell apart.

In a case involving the fraudulent sale of apartments converted to "condominiums," the 9th Circuit Court of Appeals said in a footnote:

> Although U.S.S.G. § 2B1.1 is silent as to the appropriate valuation date for a loss determination, in this case, the actual loss to the victims at the time of the fraud, as opposed to the time of trial or sentencing, best captures Defendants' culpability. The volatile nature of the real estate market is wholly independent of Defendants' actions and, for sentencing purposes, they should not benefit from the ultimate conversion of the units into condominiums. See United States v. Gordon, 393 F.3d 1044, 1052 n. 6 (9th Cir.2004) ("there is little logic in increasing or decreasing a defendant's sentence as a result of unpredictable fluctuating values for misappropriated items in a punitive context"); United States v. Bae, 250 F.3d 774, 776 (D.C.Cir.2001) ("the loss associated with their fraudulent procurement is equal to the value of the goods at the time of the offense").

*Crandall* at 915, n. 8. Like *Crandall*, the actual loss to the victims in the instant case should be based on the fair market value of the houses at the time of the fraudulent activity. The volatility of the real estate market before, during, and after the fraudulent activity makes it difficult at best to determine the actual or intended loss.

Defendant also objects to the addition of 2 levels to the base offense level, which was based on the number of purported victims (10 or more victims). Defendant's offense involved less than 10 victims. Moreover, "'victim' means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); ... 'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." USSG § 2B1.1, cmt, n.1. In this case, the draft PSR has not identified 10 or more victims who sustained an actual loss. Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, cmt. n. 3(A)(i).

**Objection 11 - Page 9, Paragraph 38 Offense Level Computations**

Defendant objects to this paragraph (4 levels added for organizer or leader). The evidence did not show that defendant was an organizer or leader in criminal activity involving five or more participants. See Objection 8.

**Objection 12 - Page 9, Paragraphs 40 and 42 Offense Level Computations**

Defendant objects to this paragraph (total offense level 28). Because the government has not produced evidence of a loss, or that Defendant Dobos was an organizer or leader, or that the offense involved 10 or more victims, the total offense level should be 2. This calculation is based on a base offense level of 7, minus three levels for acceptance of responsibility and two levels for Defendant's mitigated role.

An alternative loss calculation would result in an offense level of 12. The government did present some evidence at trial through the testimony of Co-defendant Irimiciuc that Defendant Dobos participated in the purchase of the houses at 6802 West Briles Road, Peoria ($65,300 cash back) [Superseding Indictment, doc. 259, ¶ 29] and 27838 N. 60 Lane, Phoenix ($81,209 cash back) [Superseding Indictment, doc. 259, ¶ 29]. Co-defendant Irimiciuc purchased the Briles Road and N. 60th Lane houses and Co-Defendant Swallows was involved in both sales. Defendant Dobos' factual basis in his plea agreement describes his involvement in the sale and cash back from the house at 18402 N. 75th Avenue (cash back $50,000)[Superseding Indictment, doc. 259, ¶ 31]. The total cash back from those three properties is $196,509. It can be argued that Defendant Dobos gained $196,509 due to the wire fraud involving those properties. Because it is difficult to determine the intended or actual loss in this case, a measure

of loss could be the gain. *See* USSG § 2B1.1, cmt. n. 3(B)(The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.).

Using $196,509 as a measure of loss, the offense level under USSG § 2B1.1(a)(1) and (b) would be 17. Defendant Dobos should be credited with a reduction of 5 levels due to acceptance of responsibility and a mitigated role. With a criminal history category of III, the guideline sentence should be 15-21 months.

**III.   Conclusion**

Defendant Dobos respectfully objects to the portions of the draft PSR as described above. The draft PSR paints a picture of Defendant Sam Dobos being an organizer and leader, responsible for the entire purported loss amount, when in reality, based on the evidence, Defendant Dobos was a minor participant, whose role involved less than 10 victims. Defendant will address in his Sentencing Memorandum issues that relate to the imposition of a reasonable sentence under the facts and circumstances of this case.

RESPECTFULLY SUBMITTED this 14th day of May, 2010.

By s/ Robert J. Kavanagh
ROBERT J. KAVANAGH
Attorney for Defendant Dobos

CERTIFICATE OF SERVICE

I certify that on May 14, 2010 I electronically transmitted this document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kevin Rapp
James Knapp
Assistant U.S. Attorneys