DENNIS K. BURKE
United States Attorney
District of Arizona

KEVIN M. RAPP
Assistant U.S. Attorney
Arizona State Bar No. 14249
kevin.rapp@usdoj.gov
JAMES KNAPP
Assistant U.S. Attorney
Arizona State Bar No. 21166
james.knapp2@usdoj.gov
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | CR-08-0612-PHX-NVW |
|---|---|
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS AND SENTENCING MEMORANDUM FOR BOTH DEFENDANTS** |
| v. | |
| 5.   Samuel T. Dobos, | |
| 10. Georgiana Dobos, | |
| Defendants. | |

The Plaintiff, United States of America, files a response to Samuel T. Dobos's ("S. Dobos) objections and a sentencing memorandum for the Court's consideration. For the sake of efficiency and consistency between husband and wife Defendants, the government believes it is most logical to file its response to the Defendant's objections, its own PSR objections, address both Sentencing Guidelines ("U.S.S.G.") and § 3553 factors, and provide a sentencing recommendation for both Defendants in a single memorandum.

This memorandum is divided into seven sections. Section I provides an overview of how the underlying scheme worked and the Defendants' involvement. Section II addresses S. Dobos's objections, Section III details the Government's Objections, Section IV addresses a potential upward departure to reflect losses to the neighborhoods in which the foreclosed houses are located, Section V analyzes 18 U.S.C. § 3553 factors, Section VI analyzes their cooperation

pursuant to U.S.S.G. § 5K1.1, and Section VII provides the Court with a structured  sentencing recommendation.

**I. Overview: How the Scheme Worked**.

Defendants Daniel Morar ("Morar"), S. Dobos and Georgiana Dobos ("G. Dobos"), and unindicted co-conspirator Cornel Bizgan[1] ("Bizgan") were the leaders of a mortgage fraud conspiracy during 2006. According to S. Dobos, he was introduced to Morar and Bizgan in 2006. Morar told S. Dobos about a plan to use "other people" to buy homes with doctored loan applications and thereby receive cash back. (*See* Exhibit A; Interview of Samuel Dobos, dated 12/12/09, ¶ 7.) Morar advised S. Dobos that he intended to use the cash-back proceeds to convert the homes into adult care businesses. (*Id* at ¶ 8). According to S. Dobos, his wife suggested that her father Gheorghe Babeti ("Babeti") be the purchaser of multiple homes. (*Id* at ¶ 9*)*. Babeti confirms that he did indeed act as a straw buyer at the direction of his daughter and son-in-law. (*See* doc. # 196; Babeti plea agreement, factual basis, p.7.) According to G. Dobos, co-Defendant Cipriano Ionutescu referred Babeti to loan officer Catherine Zebarth (*see* Exhibit B; Interview of Georgiana Dobos, dated 11/4/09, ¶ 20.), so that Babeti could sign the loan applications and Zebarth could then input inflated income and other figures to ensure that the loan was approved. *Id*.

Morar introduced G. Dobos to Cosmina Bunea ("Bunea") (*See* Exhibit B; ¶ 3), who, like Babeti, also acted as a straw buyer to purchase eleven homes in furtherance of the conspiracy (*See* Exhibit G; property transactions.) In late 2006, G. Dobos approached neighbor and real estate agent Natasha Swallows ("Swallows") to discuss the possibility of Bunea buying properties that Swallows was listing. (*See* Exhibit B; ¶ 1.)  Swallows was in turn introduced to Morar and Bizgan, who discussed purchasing the homes and receiving cash back. (*Id*. at ¶ 4.) G. Dobos and Swallows also discussed splitting the commission on the sale of the properties. *Id*.  G. Dobos agrees that she knew that the loan applications submitted by Bunea contained false

---

[1]   Upon information and belief, Cornel Bizgan has fled the United States to the Dominican Republic. He is currently the subject of an investigation and the United States intends to seek his extradition.

information. (*Id.* at ¶ 9.)

In addition to Bunea and Babeti, Dorel Irimiciuc ("Irimiciuc") was also referred to Swallows as a willing straw buyer. S. Dobos recalls speaking with Irimiciuc in Romania and asking about his social security number. ( *See* Exhibit A; ¶ 11.) S. Dobos, however, takes issue with Irimiciuc's trial testimony that S. Dobos purchased a plane ticket for him. He does concede, however, that he lent Irimiciuc $10,000 to qualify to purchase Swallow's home. (*See* Exhibit A; ¶¶ 13-14.) G. Dobos confirms that she received a referral fee of $1,400 in cash from Swallows and other benefits for directing Irimiciuc to her. (*See* Exhibit B; ¶ 7.)

Valeriu David Manolescu ("Manolescu"), a trial witness, was contacted by S. Dobos about a real estate investment scheme. (*See* Exhibit C, Interview of Valeriu Manolescu, dated 11/26/08, ¶ 3.) S. Dobos referred Manolescu to Swallows to purchase homes, intending to have Manolescu act as a straw buyer. This plan largely worked, as Manolescu used his girlfriend Ramona Oprea as a straw buyer to buy several properties. (*See* Exhibit A; ¶ 20, and Exhibit B; ¶ 12.) According to Manolescu, S. Dobos told him he could get as much as $90,000 in cash-back proceeds for participating in the scheme. (*See* Exhibit C; ¶ 5.) Also, S. Dobos was the one who proposed using a third party to receive the cash back. *(Id.* at ¶ 6.) Lastly, S. Dobos received $25,000 from the cash back proceeds received by Manolescu. (*Id.* at ¶ 7).

G. Dobos was aware that both Morar and Bunea left the United States with the cash-back proceeds that they received from the purchases. (*See* Exhibit B; ¶ 9.) G. Dobos claims that, in contrast with Morar and Bunea, she and S. Dobos received very little profit from the cash-back scheme. She admits that their earnings include a $12,000 couch from Robb and Stuckey, given to the couple by Morar. (*See* Exhibit B; ¶ 25.) In addition, Morar gave S. and G. Dobos between $60,000 and $70,000 in cash as compensation for all of Babeti's purchases, which G. Dobos claims they spent in two months on mortgage payments for these homes. (*See* Exhibit B; ¶ 13.) Other proceeds reported by G. Dobos include payments of $2,000-$3,000 given to the Doboses by Morar for each of the [eleven] properties purchased by Bunea, as well as the previously mentioned referral fee from Swallows. (*See* Exhibit B; ¶¶ 7 and 13.)

Bank records for G. Dobos's Chase checking account reveal inconsistencies between her stated earnings from the cash-back scheme and the couples' expenditures. (*See* Exhibit J(a)-(c); analysis of account activity in S. and G. Dobos' bank accounts.)   For example, while she claims that they used the $60,000-$70,000 cash compensation from Morar to make two months of mortgage payments on the properties purchased by Babeti, there is only one electronic withdrawal for a mortgage payment that was not for their primary residence. *Id*. There are, however, over $43,000 in cash withdrawals from this account. *Id*. The account records further reveal a pattern of lavish spending over the course of the scheme, including over $600 spent on family portraits, nearly $4,000 spent on a cruise and car rentals in Miami, Florida, and more than $2,300 spent on clothing and electronics. *Id*. G. Dobos claims that money used to cover living expenses, housing costs, and the purchases of a Hummer and an Infiniti came from a gift of $100,000 from S. Dobos's mother. (*See* Exhibit B; ¶ 26.) However, the government cannot locate any evidence of a $100,000 loan or gift from S. Dobos's parents to S. and G. Dobos.[2] Further evincing a fraudulent scheme is the fact that mortgage payments ceased on the homes purchased by Bunea, Babeti, and Irmiciuc, and the properties then went into foreclosure.

**II. Samuel Dobos's Objections to the Presentence Report.**

**A. Objection 1-Page 4, Paragraph 9 the Offense Conduct**

The Defendant objects to the characterization that he knowingly and willfully devised a "cash back" home-buying scheme. But by his own admission, Defendant met with Morar and Bizgan and therefore  knowingly participated in said scheme. (*See* Exhibit A; ¶¶ 6-8.) Defendant knew that both  Babeti and  Bunea were being used as straw buyers. He even referred Manolescu to Swallows as a straw buyer candidate. Defendant also contacted Irimiciuc in Romania and was actively involved in using him as a straw buyer. The PSR should thus remain unchanged.

**B. Objection 2-Page 4, Paragraph 10 Offense Conduct**

Defense objects to the characterization that he recruited others to participate in the scheme. This is puzzling, however, since by his own admission he contacted Irimiciuc and sold

---

[2]  It is more than a coincidence that the Doboses received almost exactly $100,000 from Morar for the Babeti and Bunea purchases.

him at least one property. (*See* Exhibit A; ¶ 11.) Defendant also recruited Manolescu, who used his girlfriend Ramona Oprea as a straw buyer for multiple properties. (*See* Exhibit B; ¶ 12; Exhibit C; ¶ 3.) Nor can S. Dobos deny knowing that Bunea and Babeti were involved in purchasing properties pursuant to the scheme.  According to S. Dobos he was the one who contacted Iontescu about properties Babeti could purchase. (*See* Exhibit A; ¶ 22.) Finally, Defendant received a cash kickback from the proceeds that Manolescu received from the purchases. (*See* Exhibit C; ¶ 7.)

Swallows has confirmed Defendant S. Dobos's involvement in this scheme. She told investigating agents that S. Dobos initiated contact with her by inquiring about buying a few houses for investment purposes. (*See* Exhibit D; Interview of Natasha Swallows 03/10/2008, p. 2.) Indeed, S. Dobos told her that he was the "head" of an investment group. *Id*. S. Dobos brought Morar and another Romanian male to Swallows's office.[3] Moreover, according to Swallows, S. Dobos told her how to complete the purchase contracts and to refrain from sending them to the lender. (*Id*. at p.3.)  When Swallows had concerns about Manolescu, she communicated them to Defendant who vouched for him. (*Id*. at ¶ 5). In sum, witness interviews with Swallows and others paint a far clearer picture of S. Dobos's involvement than what he himself admits to. Accordingly, the PSR should remain unchanged.

### C. Objection 3-Page 4, Paragraph 11 the Offense Conduct

Defendant S. Dobos objects to Swallows's statement that he retained her services to submit purchase contracts for five homes purchased by Bunea. G. Dobos, however, affirms Swallows's contention. (*See* Exhibit B; ¶ 10, and Exhibit D.) S. Dobos told Swallows to characterize the seller's concession as "repairs/remodeling" and not to fax the addendum. (*See* Exhibit D; pp.3-4.) The PSR should remain unchanged in this regard.

### D. Objection 4-page 4, Paragraph 12 the Offense Conduct.

Defense objects to Swallows's statement that he directed Swallows to omit separate addenda to purchase contracts from correspondence with at least two loan officers. (*See* Exhibit

---

[3] This Romanian male is likely Bizgan.

D; pp. 3-4.) Dobos told agents in a proffer that he did not recall if he was involved in the submission of the purchase contract. (*See* Exhibit A, p. ¶ 6.) As Defendant cannot produce anything to cast doubt on Swallows's story, the PSR should remain unchanged.

### E. Objection 5-page 5, Paragraph 16 the Offense Conduct.

Defendant objects to the statements that he gave Irimiciuc $37,500 from an account owned by co-Defendant Morar. S. Dobos concedes that he did give Irimiciuc $10,000. (*See* Exhibit A; ¶ 13.) The PSR can be amended as there is no evidence to demonstrate where the $37,500 came from.

### F. Objection 6-page 7, Paragraph 23 Culpability Assessment.

S. Dobos objects to the characterization that he recruited Babeti to purchase ten properties. Admittedly, it was G. Dobos who enlisted Babeti to purchase the properties. (*See* Exhibit B; ¶ 4.) S. Dobos, however, was aware that Babeti was purchasing properties. He even sold two properties to Babeti himself. Together the Doboses received between $60,000 and $70,000 in cash from Babeti's purchase proceeds. The PSR should thus remain unchanged.

### G. Objection 7-page 7, Paragraph 25 Culpability Assessment.

Defendant again objects to the characterization that he recruited Irimiciuc as a straw buyer. He admits, however, that he contacted Irimiciuc in Romania. (*See* Exhibit A; ¶ 11.) Irimiciuc advised agents that he was contacted by S. Dobos for the purpose of engaging in the cash back real estate transactions. (*See* Exhibit E; Interview Irimiciuc, dated 02/24/2009, ¶¶ 1-4.) S. Dobos and his wife benefitted financially from the sale of Briles (Swallows's home) to Irimiciuc. (*See* Exhibit A; ¶ 15, and Exhibit B; ¶ 7.) The PSR should remain unchanged.

### H. Objection 8-page 7, Paragraph 26 Culpability Assessment.

Defendant objects in general terms to the characterization that he recruited other straw buyers and that he benefitted from the scheme. S. Dobos attempts to confine the scope of his complicity to selling his house to Babeti. But the evidence is clear that he recruited both Irimiciuc and Manolescu into the scheme. (*See* Exhibit C; ¶ 3, and Exhibit E; ¶ 2.) He also met with loan officer Korey Makela for the purpose of referring investors to him. (*See* Exhibit F; Interview of Korey Makela, dated 12/12/2008, ¶ 9.) He was also aware that his wife sold homes

1  to both Bunea and Babeti. Accordingly, he is responsible for a loss of $6,659,540 in jointly
2  undertaken criminal activity. (*See* U.S.S.G. § 1B1.3(1)(B).)[4]

3      Defendant argues that he was a minor participant in the criminal scheme. To be
4  considered a minor participant, a defendant must have performed only a limited function in
5  concerted criminal activity. (*See* § 3B1.2 (Application note 3 (A)).) Here, as illustrated above,
6  interviews with Irimiciuc, Swallows, Manolescu, and Makela show that Defendant was much
7  more than a minor player. Indeed, his recruiting efforts furthered and enhanced the scheme. For
8  sentencing purposes, then, he should be assessed at least a two-level increase for leadership, not
9  a decrease for being a minor participant, as urged by defense counsel.

10      **I. Objection 9-page 8, Paragraph 32 Victim Impact.**

11      Defendant objects to the characterization that twenty financial institutions and financing
12  companies were negatively impacted by the offenses committed. (*See* PSR ¶ 21.)  This figure
13  is based on the twenty-five properties that were purchased that went into foreclosure. (*See*
14  Exhibit G.)[5] Defendant was a member of the conspiracy that caused these lending institutions'
15  losses and should thus receive a two-level increase. (*See* U.S.S.G. § 2B1.1(b)(2)(A).)

16      **J. Objection 10-page 9, Paragraph 36 Offense Level Computations.**

17      S. Dobos objects to the loss amount of more than  $2,500,00 but less than $7,000,000
18   (\$6,659,540). Defendant would prefer to focus on intended loss rather than actual loss, and
19  relies on *United States v. Crandall*, 525 F.3d 907, 914 (9th Cir. 2008), to demonstrate that, like
20  the defendants in *Crandall*, his intention was to renovate the homes and sell them at a profit.
21  Defendant misses the ultimate point of *Crandall,* which determined that the loss suffered by the
22  buyers should be measured in terms of actual loss.[6] Dobos's intent in purchasing homes using
23  unqualified straw buyers is entirely irrelevant considering the high amount of actual loss suffered
24  by the banks and lending institutions. Actual loss is defined as "the reasonably foreseeable

25  _____

26      [4] Exhibit G, property transactions

27      [5] There were 25 subject properties that involved 26 transactions.

28      [6]  The Ninth Circuit relied on the Application Notes to Section 2B1.1, which hold that
    "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Application Note 3(A).

pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(i). In the present case, the pecuniary losses suffered by the banks and lending institutions was reasonably foreseeable on the part of the Defendants. S. Dobos knew that the borrowers were not qualified to purchase the homes, that the scheme required submission of fraudulent loan applications, and that he and his wife – and not the straw buyers themselves – would be paying the mortgages on the properties using money provided by Morar. (*See* Exhibit B; ¶ 13.)

S. Dobos was actively involved in a jointly undertaken criminal activity that involved the fraudulent submission of false loan applications. Defendant helped cause the lending institutions in question to believe they were dealing with qualified buyers. He knew about and benefitted from the inflated sales prices of the homes in question. He even helped keep the lenders in the dark by scheduling property closings within mere days of each other so that the previous mortgages would not appear on the (straw) borrowers' credit reports. The $6,659,540 loss, as detailed in Exhibit G, reflects an actual loss calculation of the kind that has been accepted in similar mortgage fraud schemes cases in the District of Arizona.[7]

### K. Objection 11-page 9, Paragraph 38 Offense Level Computations.

Defendant objects to being characterized as an organizer or leader of the conspiracy. A four-level enhancement is authorized under U.S.S.G. § 3B1.1(a) "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id.* Currently, the PSR characterizes the Doboses as leaders under the meaning of U.S.S.G. § 3B1.1(a). (*See* PSRs ¶ 36 (G. Dobos) and ¶ 38 (S.Dobos).)

Section 3B1.1(a) may be applied here because the scheme "involved five or more participants . . . ." Indeed, eight persons have pleaded guilty in this case. The complicity of multiple straw buyers also makes the scheme "extensive," regardless of whether or not they are prosecuted. *See* U.S.S.G. § 3B1.1, note 3 ("In assessing whether an organization is 'otherwise extensive,' *all persons involved in the entire offense* are to be considered.") (emphasis added).

---

[7] *See, e.g., United States v. Lutrell Sharpe*, CR-07-00544-PHX-ROS; *United States v. Mario Bernadel, CR 08-00256-PHX-SMM; United States v. Felix Guzman, Jr. CR-08-00598;* and in the instant case with the co-Defendants Babeti and Brandon Azedegan.

On the merits, both S. and G. Dobos qualify as "organizers or leaders" because they oversaw the execution of the scheme, exercised decision making authority, recruited others to assist in the scheme, and—perhaps most importantly—stood to collect the profits. *See* U.S.S.G § 3B1.1, note 4 ("Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, [and] the claimed right to a larger share of the fruits of the crime . . . .").

S. Dobos was one of several organizers and leaders. He managed, inter alia, Irimiciuc and Manolescu's involvement. The government nevertheless recommends that he receive just a two level enhancement; co-Defendants Bizgan and Morar are arguably more responsible since they devised the scheme and sought out the Doboses to participate in its execution. Moreover, Morar apparently fled the United States after receiving the majority of the cash-back money and he, not S. Dobos, recruited Bunea.

G. Dobos, however, should get a three-level increase pursuant to § 3B1.1(b). While not as responsible as Bizgan or Morar, she held a real estate license, enlisted her father to purchase ten properties, and was more heavily involved in facilitating the transactions than was her husband.

**L. Objection 12-page 9, Paragraphs 40 and 42 Offense Level Computation.**

Defendant here reiterates his objection to the increase for loss and leadership. He objects to the number of victims and requests a two-level reduction for minor role status. He further provides an alternative loss calculation based on the losses from just three purchases he was directly involved in. He also maintains the loss only should be on the cash back rather than the entire loss to the lenders.

*First*, the facts, as argued above, do not support a minor role adjustment. *Second*, as the Defendant was involved in a jointly undertaken criminal activity he is responsible for losses on more than the three properties that he himself was directly involved in. His suggested loss calculation is entirely unsupported by the guidelines. By contrast, the loss calculation

9

1  recommended by the government – the accepted loss calculation in the District of Arizona[8]–

2  includes the purchase price of each property during the conspiracy minus its value at the time

3  of foreclosure.

4  **III. Government Objections**

5      As detailed below, the PSR fails to assess a number of upward adjustments that would

6  increase the Defendants' guideline range beyond what is calculated in the PSR.

7      **A. Sophisticated Means Pursuant to Section 2B1.1(b)(9)(C)**

8      The PSR fails to impose a two-level enhancement for sophisticated means pursuant to

9  U.S.S.G. § 2B1.1(b)(9). There is little question that the Defendants' scheme involved the

10  following sophisticated means: (1) recruiting straw buyers to purchase subject properties in order

11  to make a profit; (2) preparing phony rental agreements to bolster the straw buyers'

12  creditworthiness; (3) falsifying loan applications with respect to straw buyers' assets, income

13  and liabilities; (4) producing fraudulent verifications of employment; (5) forgery on real estate

14  documents; (6) "shotgunning" the closings so that the homes would not appear on the straw

15  buyers' credit score; (7) omitting addenda to purchase contracts so lenders would not discover

16  the scheme; and (8) disguising the cash back as going to a third party LLC when in fact it was

17  going, in part, to the Doboses.

18      The use of any one of the tactics alone would arguably justify the enhancement. *See, e.g.*,

19  *United States v. Garro*, 517 F.3d 1163, 1169 (9th Cir. 2008) (deeming scheme that involved,

20  among other things, "forged signatures on real estate transactions" to be sophisticated); *United*

21  *States v. Aragbaye*, 234 F.3d 1101, 1107-1008 (9th Cir. 2000) (upholding "sophisticated means"

22  sentencing enhancement for a tax preparer who had filed fraudulent tax returns using false

23  names, social security numbers, employment records, and depositing refunds through a shell

24

25

26

27

28      [8] Each U.S. District Court Judge in the District of Arizona who has presided over a cash back mortgage fraud scheme since 2008 has utilized this loss calculation.

business). Accordingly, the PSR should include a two-level enhancement for sophisticated means pursuant to U.S.S.G. § 2b1.1(b)(9).[9]

### B. Derivation of More Than $1,000,000 in Gross Receipts From Financial Institutions Pursuant to Section 2B1.1(b)(14)(A).

The PSR also fails to impose a two-level enhancement for derivation of more than $1,000,000 in gross receipts from financial institutions pursuant to § 2B1.1(b)(14)(A). Defendant's scheme caused financial institutions to provide tens of millions of dollars in loans. Defendants and their co-conspirators personally and directly received gross receipts of $2,026,311.51 from the distribution of funds for cash-back proceeds derived from financial institutions as a result of the fraud. (*See* Exhibit G.) Moreover, the amount received from financial institutions in loan proceeds from the property transactions was approximately $14,900,000. *Id.* That Defendants did not receive all of this money personally is irrelevant. *See United States v. Gharbi*, 510 F.3d 550, 555-56 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 2892 (2008) ("[I]t is unavailing for [the defendant] to argue that, because the funds never passed through his hands, he did not 'derive' the loan proceeds . . . . A defendant derives proceeds under § 2B1.1(13)(A)[10] where he causes them to be lodged in another with the expectation that he will enjoy the benefits."). Accordingly, the PSR should impose a two-level enhancement.

### C. Adjustments for Role in the Offense: Special Skills

Section 3B1.3 provides for the two-level increase "if the defendant abused a position of public or private trust, *or used a special skill*, in a manner that significantly facilitated the commission or concealment of the offense...."(*Emphasis added*). A special skill is one "not possessed by members of the general public and usually requiring substantial education, training

---

[9] In *United States v. Lutrell Sharpe et al.* CR-07-00544-PHX-ROS and *United States v. Mario Bernadel, et. al.* CR-08-00256-PHX-SMM, both U.S. District Court Judges Roslyn O. Silver and Stephen M. McNamee found that similar cash back schemes *were* sophisticated within the meaning of § 2B1.1(B)(9).

[10] U.S.S.G. § 2B1.1(13)(A) regarding the derivation of more than $1,000,000.00 was renumerated as § 2B1.1(14)(A) in the 2008 edition of the United States Sentencing Commission Guidelines Manual.

or licensing." *United States  v. Hoskins*, 282 F.3d 772, 778 (9th Cir. 2002); *United States  v. Brande*, 53 Fed. App'x 338, 342 (9th Cir. 2004) (quoting U.S.S.G. § 3B1.3, cmt, n.3).

Real estate agents such as G. Dobos must complete specialized education, including 90 hours of classroom training. They also must pass a licensing examination and complete a 6-hour contract writing c o u r s e . Real estate agents perform highly skilled work such as preparing purchase contracts and interfacing with escrow officers, loan originators, appraisers, and inspectors. They must also communicate with clients, coordinate inspections, and negotiate deals . Additionally, Arizona requires 24 hours of continuing real estate education every two years to renew a license. Real estate agents must earn continuing education credits in topics such as real estate legal issues, agency law, and contract law.

Here, G. Dobos recruited the straw buyers and then referred them to other real estate agents and loan officers to complete fraudulent transactions. Catherine Zebarth, the loan officer for Babeti, testified that she dealt primarily with G. Dobos as a real estate agent. Makela similarly dealt with G. Dobos in her capacity as a real estate professional. (*See* Exhibit F; ¶ 4.) Because she used her special skills in facilitating criminal activity, G. Dobos should be subject to the two level enhancement pursuant to § 3B1.3.

### D. When Considering Loss Amounts the Court Could Also Consider the Collateral Losses to the Neighborhoods.

The Court's U.S.S.G. § 2B1.1 loss calculation could also factor in the losses to the neighborhoods of the properties in question. These losses stem from the foreclosures caused by Defendants' criminal conduct – foreclosures have collateral consequences to neighboring properties' values, and since  Defendants  knew that the vast majority of the houses involved in their scheme would go into foreclosure, they also knew or should have known that their actions would substantially and detrimentally impact nearby home and land values.

In this case, "the defendant(s) reasonably should have expected that loss would result, [and] they  can and generally should be punished more severely to account for his greater level of moral culpability . . . ." *United States v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008).  For purposes of the guidelines, "a person is presumed to have generally intended the natural and

probable consequences of his or her actions." *United States v. Alli,* 444 F.3d 34, 38 (1st Cir. 2006). Whether Defendants subjectively "intended" to damage the neighborhoods is irrelevant. They did cause significant damage to these neighborhoods, and they should be punished accordingly.

Defendants knew that the properties at issue here would go into foreclosure. They deliberately put straw buyers into multiple mortgages that they could not afford for houses that they would not live in. Defendants knew that the straw buyers were participating only because they had been lured with the promise of a share of the profits from the scheme. In most instances, the straw buyers did not even receive the mortgage bills because the lenders, believing that the homes were primary residences, were sending the bills directly there and not to the straw buyers' true residences. Defendants only paid a few months of initial mortgage payments before defaulting.

Defendants also reasonably should have understood that the practically inevitable foreclosures would negatively impact the value of nearby homes in the neighborhoods. Defendants knew that the houses would be vacant for long periods of time (often even before being foreclosed upon) and should have known that vacant houses are subject to disrepair, decay, break-ins, and vandalism. Defendants were experienced enough in the real estate industry to know well how a foreclosure on one house affects the value of all the homes in a neighborhood.

The Eighth Circuit recently has recognized in *dicta* in *United States v. Parish*, 565 F.3d 528 (8th Cir. 2009), that mortgage fraud causes losses beyond those merely inflicted on lenders. In affirming a district court's loss calculation estimate of between $20,000,000 and $50,000,000, the Eighth Circuit noted that the district court had not even considered "the amount of loss attributed to the remaining classes of victims. *The financial injuries to subcontractors*, *suppliers, buyers, renters*, *other home owners, the affected cities, and others were real and considerable.*" *Id.* at 535-36 (emphasis added). In *Parish*, the Court recognized that these losses would have been foreseeable because the defendants "knew, or at the very least, should have known, the conspiracy would eventually unravel leaving as many as 25 homes vacant and pending foreclosure. Defendants reasonably could foresee the depressing impact such an

13

occurrence would have *on the local markets and on these property values*." *Id.* (emphasis added). Thus, the losses to the neighborhoods were foreseeable to defendants and should be considered by the Court when evaluating losses pursuant to U.S.S.G. § 2B1.1(b)(1).

## IV. The Court Could Depart Upward Pursuant to U.S.S.G. § 5K2.5 to Reflect the Losses to the Neighborhoods

Even if this Court does not include the losses to the neighborhoods in its U.S.S.G. § 2B1.1(b)(1) actual loss calculation, it could depart upward so that the sentence adequately reflects the losses Defendants inflicted on the neighborhoods. Courts of appeal have routinely affirmed district courts' decisions to *double* sentences pursuant to U.S.S.G. § 5K2.5 from what they otherwise would have been. *See, e.g.*, *United States v. Hummer*, 916 F.2d 186, 194-95 (4th Cir. 1990) (approving upward departure to 151 months from range of 70-87 months under U.S.S.G. §§ 5K2.5 and 5K2.14).

An upward departure on this basis is particularly appropriate when fraud damages private communities in addition to banks or lending institutions. Indeed, the Sixth Circuit recently affirmed an upward departure under U.S.S.G. § 5K2.5 in a bank/wire fraud case, where the advisory guideline range was 188-235 months, and the district court departed upward to 300 months. *United States v. Erpenbeck*, 532 F.3d 423, 440 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 518 (2008) (warranting departure because of "the devastating effect that [defendant's] fraudulent scheme had . . . [homes were] left in disrepair, streets and parking lots remained unpaved, and some homeowners were left with acrid waterways instead of the pristine lakes promised"). All twenty-six fraudulent transactions that Defendants and their co-conspirators executed ended in foreclosure. Empirical research, along with common sense, has dictated that foreclosures result in "vacant, boarded-up, or abandoned properties . . . [that], in turn, contribute to physical disorder in a community, create a haven for criminal activity, discourage the formation of social capital, and lead to further disinvestment."[11] Foreclosed homes also typically sell at a discount,

---

[11] Immergluck, Dan, and Geoff Smith. 2006. *The Impact of Single Family Mortgage Foreclosures on Neighborhood Crime. Housing Studies*, 21(6): 851-866; see also Schuetz, Jenny, et al., *Neighborhood Effects of Concentrated Mortgage Foreclosures* (NYU Center for
(continued...)

1   driving down property values for the entire neighborhood.

2   **V. Analysis of factors pursuant to Title 18, U.S.C. § 3553.**

3       **A.      Nature and Circumstances of the Offense**

4       Both defendants  pleaded guilty to conspiring to commit wire fraud. Over a period of a

5   year, Defendants and their  co-conspirators solicited several  straw buyers to engage in

6   fraudulent transactions. They located target properties with the assistance of Swallows. By

7   their own admission they received $60,000 to $70,000 for Babeti's purchases and

8   approximately $30,000 for Bunea's purchases.  Twenty-five properties went into foreclosure.

9   The losses to lenders from the charged conspiracy were approximately $6.6 million. (*See*

10  Exhibit G.) The neighborhoods affected by foreclosures stemming from the fraud suffered

11  additional losses.

12      **B.      History and Characteristics of the Defendants**

13      Defendants have been married since 2000 and have four children under the age of

14  nine.  S. Dobos has a substantial criminal history beginning at age seventeen. Indeed, this is

15  S. Dobos' fourth  felony conviction. He had substance abuse problems as a young adult,

16  which he has apparently overcome in recent years. Defendant's employment record is

17  sporadic. He has worked  in the real estate industry, owned  fledgling flooring stores, and

18  remodeled houses. (*See* PSR ¶ 60 .)  It does appear from the record, however, that  S. Dobos

19  is relatively resourceful and motivated, and as an adult he was responsible for supporting his

20  four children. On balance, with the exception of his work history and family obligations,

21  Defendant's  history and characteristics do not particularly weigh in his  favor for sentencing

22  purposes.

23      With respect to G. Dobos, she has had no prior contact with the criminal justice

24  system. She has maintained her aforementioned real estate license. She has substantial family

25  obligations as the mother of four children. Most recently, she has been serving as the primary

26  

27  _____

28      [11] (...continued)
    Law and Economics, Working Paper No. 08-41, 2008) for a study of how concentrated
    foreclosures negatively affect neighboring housing prices.

1   caretaker for the couple's four children while S. Dobos has been in custody. Her history and

2   characteristics do weigh in her favor.

3         **C.**    <u>**Seriousness of the Offense, Respect for the Law, and Just Punishment**</u>

4         Courts have recognized that "white collar crime . . . requires heavy sentences to deter

5   because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th

6   Cir. 1997) (emphasis added). Defendants must pay their debt to society for the damage they

7   inflicted on our financial markets, our neighborhoods, and to the victim lenders in question.

8   Only a prison sentence will be sufficient to deter others tempted to engage in this lucrative

9   crime.   In determining a sentence, section 3553(a)(2)(a) of Title 18 directs the court to

10  consider: (1) the seriousness of the offense, (2) promotion of respect for the law, and (3)

11  provision of a just punishment.

12        A just punishment is basically an appropriate sentence, given a defendant's particular

13  unlawful conduct. Mortgage fraud offenses are extremely serious.  Here, the damage

14  Defendants' conspiracy inflicted on lenders was staggering, with direct losses of $6.6 million

15  and collateral  losses even higher. It is difficult to calculate just how costly and burdensome

16  such criminal activity is to society in general – the losses that lenders sustain from mortgage

17  fraud necessarily result in higher mortgage rates for all borrowers, or difficulty in obtaining a

18  mortgage, foreclosure costs, loss of liquidity, and systemic loss of confidence in the

19  mortgage loan industry generally. The Defendants must be punished for their crime by

20  spending time in prison.

21        **D.**    <u>**The Need to Afford Adequate Deterrence**</u>

22        Under Section 3553(a), the need for the sentence to "afford adequate deterrence to

23  criminal conduct" must also be considered.  18 U.S.C. § 3553(a)(2)(B).  The enormity and

24  audacity of these crimes has understandably captured the attention of both the general public

25  and members of the mortgage, banking, and real estate  industries.  Thus, the deterrent

26  message and effect of the sentence imposed by the Court in this case will resonate

27  significantly with any individual or real estate professional tempted to engage in conduct

28  similar to Defendants'.  This need for deterrence is especially important for local real estate

1   agents and self-proclaimed real estate investors.  The Government further respectfully

2   submits that the Court should consider that Defendants committed the instant offense by

3   using friends (Manolescu and Irimiciuc) and family (Babeti) to faciliate the scheme. The

4   term of imprisonment imposed  should reinforce the deterrent message conveyed by any prior

5   mortgage fraud sentences. (*See* Exhibit H; ; Cash Back Mortgage Fraud Convictions in the

6   District of Arizona, 2008-2010, and Exhibit I; Mortgage Fraud Sentences Nationally.)

7       Indeed, there is a massive need for deterrence from mortgage fraud.  The Mortgage

8   Asset Research Institute's April 2010 report stated that "[f]raud continues to be a pervasive

9   issue, growing and escalating in complexity." *See* Mortgage Asset Research Institute,

10  Twelfth Periodic  Mortgage Fraud Case Report (2010), *available at* risk.lexisnexis.com/mari.

11  There were 67,190 mortgage fraud related suspicious activity reports filed with financial

12  institutions in fiscal year 2009, compared to 17,127 such reports in fiscal year 2004 – an

13  increase of nearly 300%.  The situation is dire.

14      White collar criminals carefully calculate before deciding whether to commit a crime.

15  That calculus necessarily involves weighing the expected benefits against the probability of

16  being prosecuted and incarcerated.  The lower the probability of being prosecuted, the higher

17  the expected prison sentence must be in order to create effective deterrence.

18  "Because economic and fraud-based crimes are more rational, cool, and calculated than

19  sudden crimes of passion or opportunity, these crimes are prime candidates for general

20  deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal

21  quotation omitted).  Because white collar criminals commit their crimes pursuant to a

22  perceived favorable cost-benefit analysis, they can be deterred with serious punishment.

23  *Martin*, 455 F.3d at 1227.

24      Mortgage fraud is much more lucrative than, say, armed bank robbery, where the

25  average takeaway is only a few thousand dollars and chances of being caught are much

26  higher.  Mortgage fraud, by contrast, is difficult to detect.  It often takes years for schemes to

27  be detected, when they are detected at all. Moreover, not every ostensibly suspicious

28  foreclosure can be investigated for practical reasons. Straw buyers often hesitate to report the

1  crime because of their own complicity. Banks often do not understand why mortgage

2  payments have not been made.  All these factors contribute to a calculus reflecting high

3  reward and low punishment.

4       Prison sentences would thus have the dual effect of punishing Defendants *and* serving

5  as a deterrent that dissuades the commission of this highly lucrative crime.  As Judge

6  Easterbrook has explained, "[t]he system of penalties under the guidelines is constructed on

7  the belief that . . . longer sentences of imprisonment are more effective deterrents.  A large

8  body of evidence supports this intuition." *United States v. Turner*, 998 F.2d 534, 536 (7th

9  Cir. 1993).  Judge Posner writes that "[a]n increase in . . . the severity of the punishment . . .

10  will raise the price of crime and therefore reduce its incidence." ECONOMIC ANALYSIS OF

11  LAW 5 (4th ed. 1992).  Too many innocent victims have had to pay the high costs associated

12  with mortgage fraud. It is time that the fraudsters who perpetrate these crimes internalize

13  those costs and learn the true price of their crimes.  This Court must shift their calculus by

14  "raising the price" of mortgage fraud with a heavy and just sentence for Defendants.  Indeed,

15  recently Courts have meted out substantial sentences for the mortgage fraud defendants (*See*

16  Exhibit I.)

17       **E.**    **The Need to Avoid Unwarranted Sentence Disparities**

18       Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid

19  unwarranted sentencing disparities."  The sentences imposed for Defendants should be in

20  parity with other Defendants sentenced in this case.

21       Co-Defendant Brandon Azadegan received an eighteen-month sentence.  Azadegan

22  cooperated shortly after arrest and testified at trial. Like S. Dobos, Azadegan was in a

23  criminal history category III. However, unlike S. Dobos, he participated in only four

24  transactions involving Babeti. He made no profit from the scheme, and cooperated

25  immediately upon arrest. By comparison, S. Dobos cooperated sixteen months after he was

26  arrested and *after* trial.

27       Co-Defendant Babeti, one of the straw buyers, was sentenced to 15 months. He did

28  not cooperate but he had no criminal  history. Babeti was unemployed and receiving

disability income. He also has a history of mental health issues. He has stated under oath that the Doboses directed him to sign the false loan applications for the purchase of ten properties.  Both Doboses should receive lengthier sentences than Azadegan and Babeti.

Lastly, co-Defendant Swallows was sentenced to two years probation.  She had never had contact with the criminal justice system, and up to her involvement in the instant offense, had led an exemplary life.  She was involved directly in only six of the twenty-six transactions and she did not participate in any of Babeti's ten transactions.  The evidence did not demonstrate that she knew that Bunea and Irimiciuc were straw buyers, but the circumstances were such that she could have *reasonably foreseen* that they were unqualified buyers.  She cooperated in March 2008 and her information was helpful to the investigation.

The Doboses should  be compared to other defendants sentenced for cash back mortgage fraud in the District of Arizona. (*See* Exhibit H.)  S. Dobos's conduct and background is most similar to self-proclaimed real estate investor and defendant Micah Bowens's.[12] Like Bowens, S. Dobos had a prior criminal history. Bowens was involved in twelve property transactions; S. Dobos in twenty-six. The loss associated with Bowens's scheme was $1,000,000 at maximum; the loss associated with S. Dobos is between $2,500,000 and $7,000,000. Bowens did not cooperate and received 44 months in prison. S. Dobos, who did cooperate, albeit late, should receive a sentence higher than co-Defendant Azadegan's 18 months but lower than Bowens's 44 months.

Likewise, G. Dobos's conduct is most similar to real estate agent Jennifer Sellers's and loan officer April Lucero's. Like Sellers and Lucero, G. Dobos is in a criminal history category I. Like them, she used her specialized professional skills to facilitate the fraud.[13] Sellers was responsible for fraudulent loan applications on nineteen properties and losses between $1,000,000 and $2,500,000. Lucero was responsible for losses on twenty-one properties totaling between $2,500,000 and $7,000,000. Lucero cooperated before trial but

---

[12]  CR-07-00544-PHX-ROS.

[13]  Sellers was both a real estate agent and a loan officer. Lucero was a loan officer.

Sellers did not. Lastly, since both Sellers and Lucero were single mothers, each received a variance from the applicable guideline for family circumstances.

By comparison, G. Dobos was responsible for foreclosures on twenty-five properties, with losses between $2,500,000 and $7,000,000. She has cooperated and a variance for family circumstances is warranted. Both Sellers and Lucero received a sentence of 24 months in prison. *Id.* G Dobos should receive a similar sentence, adjusted for her leadership role in the conspiracy.

        **F.**      **Need for Sentence to Address Additional Title 18, U.S.C. § 3553 Factors.**

The sentence advised by the guidelines is below what is reasonable based upon a consideration of the nature and circumstances of Defendant's offense and history and characteristics as discussed above, and the additional 18 U.S.C. § 3553 factors set forth below:

        (1) to protect the public from further crimes of the defendant; and

        (2) to provide the defendant with educational or vocational training, medical care, or other correctional treatment.

An appropriate sentence advised by the U.S.S.G. will address the seriousness of Defendants' criminal conduct and protect the community from further crimes. As G. Dobos will lose her real estate license because of this conviction, she could probably benefit from educational or vocational training while in custody.

**VI. Government's Motion to Authorize a Downward Departure**

Section 5K1.1 of the Sentencing Guidelines allows this Court to depart downward in the Defendants' sentence for Defendants' assistance to the government. The appropriate reduction shall be decided by the Court after consideration of certain factors. Those factors include, but are not limited to the following:

        (1) the Court's evaluation of the significance and usefulness of the Defendants' assistance, taking into consideration the government's evaluation of the assistance.

        (2) the truthfulness, completeness, and reliability of information provided by defendant;

(3)  the nature and extent of the Defendants' assistance;

(4) any injury or danger or risk of injury to the Defendants or their family resulting from his assistance;

(5)  the timeliness of the assistance.

The United States moves this Court for a downward departure pursuant to U.S.S.G. § 5K1.1 based upon Defendants' assistance to the government in its investigation of this conspiracy.

### A.   ANALYSIS

#### 1.  Significance and Usefulness of Defendants' Assistance

Defendants S. and G. Dobos cooperated with the government after pleading guilty. Their assistance was helpful enough to warrant filing a recommendation for a moderate departure. Defendants provided information regarding the circumstances surrounding the properties under investigation, and, in particular, the involvement of remaining defendant Swallows. They implicated Swallows in the preparation of addenda and the withholding of proper addenda from unwitting loan officers. Defendants also relayed information  about the involvement of co-defendants Morar and Bunea, and assisted  agents in the preparation of documents related to extraditing Bunea and Morar from Romania.

#### 2.  Truthfulness, Completeness and Reliability of Information and Testimony

Some of Defendants' information has proved truthful, having been corroborated by documentary evidence and other cooperators' accounts. Some of their statements, however, contradict statements made by other co-Defendants and witnesses. Accordingly, the government submits that Defendants' information is truthful where it can be corroborated with documents and other witness statements.

#### 3.  Nature and Extent of Defendants' Assistance

Defendants' assistance was important to understanding how the conspiracy operated, particularly with respect to Swallows's role.  Their willingness to testify against Swallows precipitated Swallows's plea agreement. As noted above, Defendants have also provided information that proved helpful in pursuing the extradition of co-defendants Bunea and Morar.

### 4. Danger of Risk or Injury

The government is not aware of any overt threats to the Dobos' safety. Still, Defendants will be entering prison having cooperated with the government, so at least a moderate risk to Defendants would seem to exist.

### 5. Timeliness of Assistance

Defendant S. Dobos's assistance was *not* timely. He waited until after trial to cooperate. Unsurprisingly, it would have been more helpful had he cooperated earlier. G. Dobos, on the other hand, cooperated before her trial. The government considers her assistance timely.

**VII. Government's Analysis of 3553 factors, Guideline Considerations, Variances and Sentencing Recommendation.**

Before the Court is a husband and wife; ages 30 and 28, respectively. They have four young children. They have different backgrounds. S. Dobos has a substantial criminal history and past exposure to drug use, while this is G. Dobos's first contact with the criminal justice system. The guidelines dictate lengthy sentences for both Defendants: 97 months for S. Dobos and 60 months for G. Dobos.[14] The stipulations in the plea also are favorable to the Defendants: S. Dobos received a cap of 33 months and G. Dobos received a cap of 27 months. Without departures or variances, their guidelines are much higher than the stipulated caps. S. Dobos also received a stipulation that his sentence would run concurrent to what he received in CR-08-763-PHX-NVW and a *recommendation* of an additional third point for early acceptance, despite pleading after trial.

The PSR fails to include adjustments that would properly increase the Defendants' guideline range. The government submits that the following is an accurate guideline calculation for both Defendants:

---

[14] G. Dobos's guideline sentence would be similar or greater than S. Dobos's but for the fact that she was allowed to plead guilty to an 18 U.S.C. § 371 conspiracy which has a statutory maximum of 60 months rather than an 18 U.S.C. §1349 conspiracy which has a statutory maximum of 30 years.

| | |
|---|---|
| Base offense level: | 27 (S. Dobos). § 2B1.1(a)(1) |
| | 26 (G. Dobos) § 2B1.1(a)(2) |
| Adjustment for Role In The Offense: | + 2 (S. Dobos) § 3B1.1(b) |
| | +3 (G. Dobos) § 3B1.1(c) |
| Adjustment for Use of Special Skill: | +2 (G. Dobos) § 3B1.3 |
| Derivation of $1M+ in Gross Receipts: | +2 (Both) § 2B1.1(b)(14)(A) |
| Acceptance of responsibility: | -3 (Both) |
| Total offense level: | S. Dobos = 28 |
| | G. Dobos = 30 |

S. Dobos has an adjusted guideline range, in a criminal history category III, of 97-121 months. G. Dobos has an adjusted guideline range, in a criminal history category I, of 97-121 months. The government recommends a twelve level departure for  both Defendants for cooperation and a variance for family circumstances. With respect to S. Dobos the government recommends a sentence of twenty-seven months with credit for time spent in custody on CR-08-763-PHX-NVW. The government does not object to a self-surrender date within three weeks of S. Dobos's date of sentencing.[15] With respect to G. Dobos, the government recommends a sentence of twenty-seven months to commence within three weeks of the release of S. Dobos.

---

[15]  This sentencing schedule will ensure that the Dobos' four young children do not suffer negative consequences from having both parents incarcerated simultaneously. This is the same rationale that motivated U.S. District Judge Kenneth Hoyt to postpone Enron CFO Andrew Fastow's sentencing to reduce the possibility that he would be imprisoned at the same time as his wife, Lea Fastow.

Respectfully submitted this 29th day of July, 2010.


DENNIS K. BURKE
United States Attorney
District of Arizona

s/Kevin M. Rapp
KEVIN M. RAPP
Assistant U.S. Attorney


CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Robert J. Kavanagh and Patricia Gitre, Attorneys for Samuel Dobos, and Anne Williams, Attorney for Georgiana Dobos.